Case No. 25-7017, VANDEMALERT Inc. Appellant v. Apple Inc. Mr. Summers for the appellant. Mr. Kleinberg for the appellate. Morning, Mr. Summers. You may proceed when you're ready. Morning. May it please the Court. This market definition appeal arises because the district court got antitrust law resoundingly wrong. For example, it fails to equate price and quality, and it focuses on Apple's status as a global company. This Court should reverse on the merits, but a narrower path also exists. That would mirror this Court's decision in Moyar, in which the Court found that there were concerns for the district court's futility analysis, and remanded for dismissal without prejudice. That would avoid affirming an incorrect decision, or writing an antitrust treatise on this record, and it would avoid jumping ahead of the district court in merits questions about content moderation on the App Store that the district court did not decide below. My impression was that the dismissal was without prejudice. Is that wrong? So the dismissal of the initial complaint was without prejudice, but the Court found that the that amendment would be futile. So if we were to affirm that would be the end of the case? That's correct. Is it is there no dismissal without prejudice that could also be the end of a case? I mean the question about whether it's preclusive, and whether if it were not time-barred, a new case could be filed. I suppose that's possible. I think it's also possible that a dismissal without prejudice can lead to the end of a case if a plaintiff decides that the district court's analysis was right, and in fact it is, you know, there is no way for them to cure. I think this is not that case. This is a case where dismissal with prejudice and a reversal or remand of the finding of futility would allow plaintiffs to, you know, either proceed on the amended complaint or file an additional complaint that addresses some of the concerns that the district court raised. Why should we take that route? It seems that phantom alert actually was responsible for some of the procedural confusion in the district court. Your brief says something about how it's standard to respond to a motion to dismiss with an amended complaint. I'm not aware of that actually being standard. So the fact that phantom alert, you know, filed late, did a non-standard response to a motion to dismiss, it had a lot of bites at the apple already. Why should we do a remand on the ground that maybe the complaint was inadequate and therefore should have been dismissed under 12b-6, but another opportunity should be made available? Why is that appropriate in this case? A, is that what you're asking for? And B, why is that appropriate here? I think either of two paths are appropriate. One would be a finding, a reversal on the merits, finding that the amended complaint did adequately state a claim. And I can walk through the various reasons why that's true. And I think we do that in our briefs extensively. Alternatively, the sort of MOYAR remand that I'm discussing would, you know, contemplate a potential dismissal without prejudice that allows us to refile. And I think the reason that it's appropriate is because I think it hinges on what we're challenging. What we're challenging is not that we had perfect procedure below. That's not our argument. What we're arguing is that the district court's futility finding below was in error. And so plaintiffs were entitled to under 1582, you know, where leave to amend is freely given. There is a valid claim to be stated, in fact, that was stated here, that we can substantiate and have substantiated already. I think the court's finding of futility, just like in MOYAR, kind of, I think the court called it premature or inappropriate in that case. And I think that's what we have here, where there are specific errors of antitrust law that, if affirmed by this circuit, would have ramifications in this circuit and beyond. And I think correcting those, you know, pointing out that there are flaws in the district court's futility analysis and allowing the case to proceed would correct those and allow plaintiffs to, you know, proceed on their case. I want to talk about the domestic market for COVID that, you know, I think the correct way to read it is that Kodak's lock-in factors can be satisfied by policy changes that impact things like quality or innovation or choice. It doesn't just have to be price. But that's what the district court held. In three different places, it says... Can we just back up? Do you think that the proposition that the app store is a relevant market is a predicate for all of your claims? Absolutely not, Your Honor. Why not? Because in count three, which is a monopolization claim for the COVID tracing app market, there's no need to plead the app store. That would also, you know, count three avoids the Amex concerns. The way your count three is pled is that because the app store is the only way for iPhone users to access apps, they are essentially hostages as to the market also of COVID-19 tracing apps. And so if it were the case that iPhone users can get apps elsewhere or just access them on their browser, your count three claim doesn't really hold together, right? So that would depend on a number of factual questions, Your Honor. It absolutely would. And as the plaintiff, it's your burden to plead under the interchangeability standards and cross-elasticity, at least some factual allegations that support your market definition. And we've put forward that. I think paragraph 87 and surrounding paragraphs, as well as the complaint as a whole, does talk about why COVID tracing apps are different than health apps and why they do require things like user-provided data that don't really make sense in the website context. I would point out that in every case that Apple cites in which there was some obvious alternative that the district court figured out, that the plaintiffs hadn't figured out, that those cases had multiple opportunities. And in fact, usually after that decision, we're given an opportunity to amend. That's things like Hicks and Psystar and Riley. I think Hicks is instructive because there the Ninth Circuit said, look, in-person golf advertising is not its own market. Like every other kind of advertising would be a totally valid and substitutable alternative. But we're remanding with instruction to dismiss without prejudice because what's obvious to us isn't really how factual determination should be made at the pleading stage. Plaintiffs ought to be given an opportunity because we think things like websites are actually obviously not substitutes. And while I think we've pled enough facts to suggest that, certainly if that's the district court's primary concern and if that's this court's primary concern, there are myriad allegations, like even more allegations that would make that even clearer. The coronavirus reporter case said, among other things, that the plaintiff needs to make an effort to define the markets, needs to distinguish the markets from one another, and can't leave the court guessing at the boundaries of each. In looking at the complaint and amended complaint and briefing, I'm just going to list 10 articulations of markets. And then if you catch any of them, well, I'll go ask the question. The U.S. smartphone-slash-tablet market, markets for the iPhone and its own tablets, the App Store, smartphone, COVID-19-related tracing apps in the App Store for use in the United States, access to apps via the App Store, coronavirus apps, access to COVID-19 tracing apps, COVID tracing apps on iPhone. It seems like there's some gap between each of those, in other words, that none of those have the exact same boundaries. So, number one, if that's wrong, tell me why you think that's wrong. If it's right, tell me why we shouldn't conclude that you have failed to distinguish markets from one another and left the court guessing at the boundaries of each. Thank you for the detailed question. The first thing I would say is I don't agree that those are each distinguishable. If you want to talk about, I could go through each of them and say why they fit into the three buckets. But I would just point out that the district court also agreed the same way that we're arguing about on appeal, that there are those three distinct markets. And those, just for clarity, are the smartphone market, the App Store market, and the COVID tracing apps market. If my colleagues will indulge me and you, I do want to give you the opportunity to say what you said that you would be able to do, which is say how, I forget exactly how you phrased it, but on that point right there, even just like the first bucket you listed, the smartphone market, you talk here about the U.S. smartphone-slash-tablet market, also the markets for the iPhone and its own tablets. Those seem like quite different boundaries than the smartphone market. I'll grant that I think we could proceed even in spite of that, but I just want to talk about the difference between smartphones in the United States and iPhones. Market definition includes those two components. It's both the product itself and the geography in which it sits. I don't think there's a distinction between smartphones and iPhones within Apple's iPhone market within the United States. Similarly, the access markets, some of which you listed, I think admittedly could have been clearer, but I do think that access, the difference between the App Store and access to the App Store, at least to me, I don't see the daylight between those. I don't see why those ought to be considered different markets. I think that to go off the coronavirus reported case, which I think you cited at the beginning of your question, I do think that that was a case in which plaintiffs had seven different opportunities to reconfigure their complaint. That's what they ended up with, was 15 different, as the Ninth Circuit said, scattershot markets that have no boundaries between them. I respect the question, of course, and I agree that we certainly could have been clearer on some points about perhaps the exact precise boundaries. Can you now give us your clearest market definition? Just tell us what market you're talking about, and are the market participants that are relevant, the app developers or the phone users? Spell it out for us as clearly as you can. What market you are contending? Is that issue here? I would love to do that. First, we have the smartphone market, and all of these are within the United States. There are three different markets, just to be very clear. The first is the smartphone market, and that includes Apple's products as well as Google's smartphones, anyone that's making smartphones. I would say the participants in that market are, one, the companies that make the smartphones, and, two, the consumers, like you and I, that own those smartphones. I'll move on to the next one if there's no questions on smartphones. I think the best way to think about it is the way that consumers access apps on the iPhone, and the participants in that market are Apple, which provides the app store, and the consumers that are using that app store. But Apple's not a participant in the market. Presumably, the app makers would be participants. I mean, Apple also makes its app. Certainly, there are developers that are engaged in that market, because otherwise, there would be nothing on the app store. I think the best way to understand the app store is… Can I try it? Of course. Are you saying that the market is ways for iPhone users to access apps like this, and the only product in that market is the Apple app store? With the exception of the phrase, like this, I would agree. I mean, obviously, this is one of the apps… Well, I think that's even harder for you. The market is methods of accessing apps for iPhone users. That's the Riley case. As Common Sense would say, if I want an app and I have an iPhone, I could download it through the app store, but I also could look at it on my browser. I could also go over to my laptop and use it on my laptop. I would expect in a complaint that says it wants this market definition to have some allegations that go to those questions, which are essentially cross-elasticity questions about your market definition. So, I do want to make a distinction here, because I think it's important to think about the fact that market definition has to be defined in relation to the conduct that's being challenged. And so, I think it kind of pushes me into the COVID tracing app market, which I do think is kind of the central market here. To explain why that's so distinct, I'll do that, but then I promise I'll come right back to the app store, which is thinking about websites specifically, right? So, the first thing is to know that on iPhones, the reason Apple is the only participant that's providing an app store is because no one else is allowed to, right? The Epic litigation clearly makes that clear. But the reason that web… Like, so you can't download… You couldn't download the Phantom Alert app if it wasn't allowed on the app store. And the reason that you can't use something like Phantom Alert on your web browser, whether it's on your laptop or even on your phone, is because there's just fundamentally different capabilities here. And we allege… So, a well-treated complaint would talk about those different capabilities, right? It wouldn't just say COVID-19 tracing is different from other health apps. That's your best allegation. That has nothing to do with suitability of your service on a web browser. So, I think that there are allegations about the sort of specific reliance on user-provided data and other things like that. Like, a lot of that comes down to things like continuous location tracking, which doesn't happen on websites, right? If you were, as I and many other people were, like traveling either between states or cities during the heart of the pandemic, put yourself in those shoes, it would be important to you, potentially, to have an app that was, you know, as you pass through a hotspot, would tell you something like, would send you a push notification saying, hey, like, maybe don't stop at a restaurant here. And that's not substitutable for me, like, pulling over and, like, opening up my laptop or even, like, trying to go on my phone and… None of that is alleged in the complaint. Even argued in your briefing. So, we do allege… Sorry, we do… Certainly, in the briefing, in the reply brief, we talk about the importance of push notifications and continuous location monitoring. And I think all of that is in response to what… I think the reason that it's not fled in the complaint is, you know, my client is an app developer. To him, it, I believe, is obvious that things like websites are not substitutes. And so, the district court submitting that it thinks that it's not substituting, those are obvious substitutes, are the reason that Hicks and Systar and Riley gave plaintiffs a chance to amend in response to what… But at least you would have argued on appeal. The district court got that wrong for that reason. And you said that the third market is COVID tracing app market. You also have alleged and argued a sub-market of access to COVID tracing apps or the COVID tracing app market. Is the word access doing work for you? I don't… Personally, I don't think it is. I think the complaint is talking, when it uses that word or not, is talking about the… Like, consumers needed the apps, right? And whether you call that access or whether you call that a market for those apps, I think is indistinguishable. And I think that certainly, right, just to bring us back to the futility analysis here, I respect that there are ways that the complaint could have been clearer. But the district court's finding wasn't that the complaint wasn't perfectly clear. It was that no complaint could have stated a claim on the facts here, right? That's the test under FOMON. That's the test under MOYAR, is that, like, for the district court's finding to be correct and to be affirmed wholesale, it has to be the case that there is no complaint, right, that it would be futile for us to amend. And I think that… I do think that we were clear both in the pleadings. I think there's enough there. And certainly, like, in our, you know, our briefs on appeal. But even in this discussion, there are… if there are ways that it could have been clearer, that doesn't turn… that doesn't get it over the line into futility. Because if striking the word access, for example, from the complaint would have made it adequately state a claim or striking the word tablets, that doesn't mean that amendment would be futile. I think that's sort of where I'd hope the court would focus is whether or not there is a claim that can be stated here. I think it was stated in the amended complaint. But I certainly think that there's more. On the geography point, the amended complaint, and I think it's at paragraph 24, talks about international uses, including use in Africa. But in light of that, what facts do you think are alleged in the complaint that explain why the app store and the COVID tracing markets are limited to the United States? So, first, I think there's two parts of that, as I understand it. One part is the allegation that it is limited to the United States. And the other part is why that's justified. So, the first part, I would point your honor to paragraph… well, paragraph 16 for the smartphone market. Paragraph 87, which talks about COVID-related tracing apps for use in the United… sorry, in the app store for use in the United States. And so, I think all of that makes pretty clear, like we are talking about the United States. And then for why that's justified, there's a few reasons. One, we do talk about how there are dramatically different regulations within the United States versus elsewhere. Versus Europe, but I don't know about the United States versus everywhere. That's true. It's true. We didn't list every other continent that might have different rules. But I think that the sort of regulatory framework within the United States, that I think in paragraph 16, we also allege that consumers in the U.S. could not avoid or defeat an increase by purchasing and importing from abroad. That would include the whole rest of the world. I think that there are reasons to think, right? Just to be really concrete about what this geographic market means, it's limited to what users can access within the United States. That might be the U.S. app store. I think I'm following that part, but it's the why that I'm still a little unclear on. As I understand it, an app developer in the U.S. can sell on the app store in the U.S. and can sell to a consumer using the app store in Africa. A developer in Africa can sell to a user of the app store in Africa and a user of the app store in the U.S. So, why have you drawn, why have you properly defined the market as just the U.S.? I want to be really clear about one of those points, which is that, hopefully the other one too, but the apps that are developed like in Africa that are available for users in the United States are within our market. Okay. What about an app developed in the U.S. that's available to a user in Africa? So, an app developed in the U.S. for a user in Africa wouldn't be included. And the reason I think is pretty straightforward that the question under, you know, colon and other cases is that the question is what users can like functionally switch to to defeat a price increase. And so, I think it's, I do think there are facts sufficient to this in the complaint, but I think the logic of it is important to explain here, if I may, which is that a user, let's say, let's say users, even like tons of users were really upset about the restrictions that Apple put in the United States. And they said, like, we really don't like that. We want our COVID tracing apps from Phantom Alert and the hundreds or thousands of others that were kind of clear cut by Apple here. The question is, like, could they successfully defeat, could and would they successfully defeat a price increase by going abroad to get, like, another app that might not even be designed for the United States? And I think sort of at an intuitive level, that doesn't make a lot of sense, right? It was a global pandemic. We talk about deaths and infection and spread. Having the idea that people would, like, travel to get access to apps abroad in order to defeat Apple's price increase is another one of those things that I just don't think makes that much sense, but was one of the foundations of the district court's holding, in part because of another error the district court made, which was focusing on where Apple sells, kind of similarly to thinking about, you know, a U.S. app developer selling in, you know, that operates internationally or something. Like, that's just not the right test. The right test is what consumers have access to because antitrust law looks at that interaction between what consumers can do and how the company will respond. And here, we have a whether or not Apple operates abroad doesn't affect consumers' ability to go abroad to get COVID tracing apps. If that were true, it would sort of, it would mow down lots and lots of the Supreme Courts and this court's and other antitrust cases that have a U.S. market, despite having a global enterprise. Returning to where we started, I just want to make sure that I understand. As you understand it, at the end of the day, as the case comes to us, the district court dismissed with prejudice? Functionally, yes, by finding that their amendment was futile. And that's what I'm saying is, even if you're not with me sort of all the way on all of these factual predicates or that the complaint did, like, quite enough, the amendment complaint did quite enough to cross that line, there's still a big hurdle for the district court to jump. And that's why I think the narrow path following Moyar might be appropriate here and might be what this court opts to do. That sounds like an argument that you're saying, that both the district court thought it was holding that no other amended complaint could state a claim and that we ought to remand because it did that analysis. And I'm not sure you presented that argument. In fact, the reply brief says, this court need only evaluate de novo whether the amended complaint stated a claim. That sounds very different from the argument you're making today. I just want to be clear that that is, I stand by that being all that this court needs to do. And I think, you know, we can, if there's other, like, questions on the other parts of the merits analysis here that the court got wrong and for why the amended complaint, like, substantiated those and is enough, I think that would be perfect. Personally, that is my preferred holding for this court to say, on the merits, the amended complaint stated a valid claim. So I'm saying that is all this court has to do. But I guess I wasn't saying that that's all the court can do. But the other side of that is you presented it. All we're doing is evaluating whether the proffered amended complaint stated a claim. And I took that to be that we could say, no, it doesn't. And the order of the district court, although appealable, it's not clear that it forecloses your refiling. But you've just said you think it is clear that it forecloses your refiling a new suit with better allegations. I think it's clear, but I would be very happy if this court didn't think so and remanded saying. You've waived that expressly in response to Judge Walker's question. Would you mind explaining how, Your Honor? He said you understand the dismissal to be with prejudice. And you said yes, because the district court decided that amendment was futile. Judge Garcia said, okay, you're understanding that to be more than saying that the amendment you proffered was futile, but that generally any amendment would be futile. I want to be clear that that is how I understand the district court's orders. What I'm saying is if this court has a different opinion and thinks that reading the district court docket, it would be appropriate to amend, and any kind of clarification of that would be very much appreciated and would allow the case to proceed, that's a perfectly fine outcome for us. I appreciate that that wasn't our forward position. But if this court has a very different understanding, and certainly you know much more than I do about how both district courts review these kinds of orders, and if that's the finding is that we do have an opportunity to amend, that's a perfectly fine outcome for us. Thank you. Thank you. Thank you, your honors. May it please the court, Julian Kleinbrodt on behalf of Apple. And I think I'd like to begin where Judge Garcia's questions were leaving us off, which is that the standard that the district court applied under this court's precedent to evaluate whether amendment would be futile has been undisputed in this appeal, at least up until a few moments ago. Under this court's precedent, when a plaintiff tenders a proposed amended complaint, futility is evaluated on whether the proposed amended complaint states a claim, applying as typical 12b6 analysis. That is what the district court did. It properly concluded that no claim was stated on multiple grounds, and it therefore deemed the proposed amended complaint to be futile. I think that the district court, like this court, was grappling with the fact that the allegations can be a bit of words. But I would like to say that while we've heard a lot about the COVID-19 app market, again, to one of the questions you asked, Judge Garcia, I think the app store-only market is the best one to start with, because Phantom Alert has said that its arguments to define a single-brand COVID-19 market, whether it's a sub-market or not, are the same as the ones it advances for the app store-only market. And so if the app store-only market goes, then I think so goes the rest of the case. And if I can address a couple of points that were made by Phantom Alert. I want to start with allegations about substitution and cross-elasticity of demand, and this case's similarity to Coronavirus Reporter from the Ninth Circuit in that regard. The markets in Coronavirus Reporter were admittedly alleged in a confusing manner, but the Ninth Circuit went on to say that even if we evaluate them as the plaintiff there had tried to articulate them more clearly, which indisputably included an app store-only market identical to the one that Phantom Alert alleges here, they have failed to substantively allege a plausible app store-only market. And the reasons the Ninth Circuit reached that conclusion are the same reasons that apply to the complaint here, which is the failure to allege the prerequisites to a single-brand market under Kodak, as well as the general failure for any market to allege facts proving up or that would prove up a market under general principles of cross-elasticity of demand and reasonable interchangeability of use. And the Ninth Circuit there found the amendment to be futile as well. Importantly, in this very similar posture, while the plaintiff there had taken multiple amendments prior to the dismissal order, the district court there did not give the plaintiff an attempt to amend again after its dismissal order. And the reason it did not do so is it said the plaintiff has had an opportunity to amend. It has had an opportunity to amend in the face of Apple's arguments, and it has failed to state a claim in this proposed, in the amended complaint there. It's the same point here. Phantom Alert filed an original complaint. Apple moved to dismiss. It put on the table all of the defects that the district court found in the complaint, and when it tendered a proposed amendment complaint in the face of all of Apple's arguments, it still failed to state a claim. And I think on that record, just as in coronavirus reporter, it's perfectly appropriate to find an amendment to be futile. With respect to the COVID-19 app market, the allegations which counsel was pointing, I don't think support the argument that a COVID-19 market was appropriately led. There is a distinction, Judge Pillard, between an access market and an app market. You were expressing some, I think, understandable confusion about how does an app store market work, and the reality is these are what we call two-sided transaction platforms, where Apple is providing a platform that intermediates between two sets of participants, developers, and consumers. So when we're talking about access, typically that is a shorthand for a transactions market, which is what the app store market is defined to be. If the plaintiff is trying to allege a sub-market, that would be a sub-market of COVID-19 app transactions, that is not adequately alleged in the complaint, and it seems to be conceded on appeal that that would not be a proper sub-market. So there must be a distinction then in the plaintiff's mind of what the app market itself is, which is not some kind of two-sided market, but some other kind of market in which the developer is the supplier and consumers are the purchaser, and COVID-19 apps themselves, not the transactions, the apps themselves must be sufficiently unique, and I think Counsel, you said that as to the app store market, you think the deficiencies with those allegations can be framed as entirely independent of the Kodak single brand aftermarket analysis, and it was just the Ninth Circuit and the coronavirus reporter treated this issue through the lens of the Kodak factors, you know, information switching costs, et cetera. So could you just explain what the defects are that you see as completely independent of the Kodak type analysis? Yeah, so in the Ninth Circuit under the precedent there, which begins in a case called NewCal carried through to Epic and then coronavirus reporter, the Kodak factors essentially form a preliminary set of threshold inquiries for a single brand market. These are the switching costs, the information costs, the change in policy considerations. What the Ninth Circuit says under its precedent is the last step in that inquiry is even if you pass all of those threshold steps to define a single brand market, is the single brand market consistent with principles across the elasticity of demand and reasonable interchangeability of use? And that, again, actually comes from Kodak itself, where it looked at all these things and said we still need to check if our general market definition principles are consistent. So we can look at the threshold Kodak factors, or we can look at the generally applicable market definition principles, and in this case I think both support the district court's decision. With respect to the COVID-19 app market, the allegations I think most critically that counsel was pointing to go to what Judge Garcia was flagging, which is whether or not COVID-19 apps are sufficiently distinct from other kinds of iOS apps. The critical lack of allegations here goes to whether there are sufficient allegations to show they are different from other forms of digital technology or software products that could be reasonably interchangeable. And so, for example, counsel was pointing to some allegations in the complaint about them being web browsing being distinct. Actually, what's referred to as distinct in paragraph 15 of the complaint are smartphones being distinct from feature phones because smartphones have more powerful web browsing technology. That doesn't say anything about whether a COVID-19 iOS app is sufficiently non-substitutable with an Android COVID-19 app or a website. What the complaint does say about COVID-19 apps and what Phantom Alert has argued on appeal is that they are portable or that Phantom and show users information about the spread of the pandemic. There are no allegations that a website, which could be accessed from the browser on your phone or tablet, is not portable or that websites or web apps, among all other sorts of things, couldn't perform similar functionalities. So it is the fundamental lack of allegations that go to cross-elasticity of demand and reasonable interchangeability of use that the district court principally cited as the flaw in the amended complaint and I think is a clear path to affirmance here. I'll just very briefly note that on the geographic market, similarly, the allegation that counsel was pointing to in paragraph 16 of the complaint is actually about phones, again, not apps or app trying to define domestic markets. There are not allegations that would support that anywhere in the complaint. The court did mention the fact that Apple is a global enterprise, but this court and HECT and the Fourth Circuit in Cologne say that where the seller operates is part of the analysis. So the district court said I have no allegations about where consumers can turn. I do have one allegation that suggests the seller operates globally. That seems at least inconsistent with the U.S. market. It's similar, Judge Walker, to the allegations you were pointing out that the restriction, it says, affected developers around the world and denied those developers access to global users. That's in paragraph 38 of the complaint on page 79 of the appendix. Again, part of the geographic market inquiry is who are the customers affected by the challenge practice. So the geographic market allegations are virtually nonexistent, but the few things that do seem to speak to parts of that analysis do not support a U.S. market, and that is what Judge McFadden was citing, and we think that was perfectly appropriate. I see my time has expired, so unless the court has questions, we will otherwise rest on the papers. Thank you, Your Honors. Is Mr. Summers reserved time for rebuttal? Take your three minutes. Do you have any beef with the way counsel for Apple described the epic factors and their applicability? I do think the Ninth Circuit has a slightly more expansive approach to the epic factors than Kodak itself does, but I think overall they pretty accurately describe, and they do include sort of a general understanding of cross-elasticity. I think that's why, you know, we talked about that and the hypothetical monopolist test and the things that support that. You mentioned Moyer a couple times, our unpublished judgment from last year, and I took a look since the last time we were up here. There, the district court dismissed with prejudice. The panel here faulted the district court for doing that, but it faulted the district court for doing that because there was a government regulation in the record. The district court cited it and quoted from it, and on the one hand, the district court said, well, the plaintiff hasn't identified any relevant regulations, but if you just read the regulation that the district court quoted, it was arguably relevant, and so the panel concluded, you know, it was probably premature to declare futility. That seems different than here because your argument on futility seems to be that even if there is nothing in the amended complaint and nothing in whatever record exists, which obviously it's hard to have much of record at the motion dismiss stage, I get that, but your argument seems to be regardless of what's in the amended complaint or the record, the district court should not declare futility unless it can be sure that something outside the complaint doesn't exist to save your suit. That seems not what Moyer said. So I want to clarify that Moyer is a mechanism that says it looks at the futility analysis and finds problems with it. Admittedly, those are different problems in Moyer versus here. I think here, the problems with the district court's futility analysis are primarily legal, although it does also sort of assume and assert its own facts, like iPhone users probably also own Android devices, but I think the reason for this court that I would encourage this court to think about that approach is because there were legal deficiencies in how the district court approached antitrust law for this purpose, and so it's possible to look at that and then say, well, that was incorrect, like, and then Moyer. We would still have to find something in your proposed amended complaint that would, under the correct legal understanding, save your suit. And I think we've provided that in the, both obviously in the complaint and in the opening reply briefs, like showing why that's sufficient. I just want to be very clear that we do think that the amended complaint is sufficient and can stand on its two feet, and reversal on the merits is appropriate for that. I think there's just sort of a narrower path that can avoid addressing some of sort of like treatise-like antitrust questions of dispute between the two parties. I guess if we were to conclude that your amended complaint still does not state a claim, what is there in the, beyond that, that you think we're supposed to look to to say, well, it should have been a dismissal without prejudice? Part of the, I think one of, there's a number of legal errors, right, that we outline in the briefs. I think one of those legal errors is the finding of futility, that the basis for that finding of futility was incorrect, used the court's own suppositions, that those are the kinds of things. So if we read your proposed amended complaint and we think this does not state a claim, then we should say that this is, should be dismissed with prejudice. I think this court could still say that it would be dismissed without prejudice, because the futility, right, I guess if you're saying, if the court, obviously if the court believes that the complaint is, that it's futile to amend, then yeah, finding that dismissal. I know you think that your amended complaint stated a claim, but if we were to conclude that your proposed amended complaint does not state a claim, then it would be proper to dismiss the suit with prejudice, correct? No, without prejudice. What outside the amended complaint are we supposed to look to to save a faulty amended complaint? The district court's reasoning. Okay. You can try to persuade them. I think it would be, right, if there was a three-page section at the end of your brief that said, if given leave to amend, we would add the following facts, and those would address any deficiencies, even though we think this complaint is enough. And if you had moved for that in the that is kind of how these things usually come up to us. But there isn't a section like that in your brief. Or sorry, that's what you would like us to think about, is aren't there other facts they could allege? I think that, I think that's, I do think that's a little stronger than the position I'm advocating for. I think, think about it this way. I think here's an easy example from the district court, or one that seems easy to me at least, but might be wrong. But the district court, says that the sub-market, add addition of the letters, like the word sub in front of market means that it's incomprehensible and can't be a real market. So the district court says, if the district court's opinion were just that, we're saying that it would have been fine if it had just said market, but it said sub-market, and that's no good. That would be, and then said, therefore, it's futile. That's what I'm saying. That kind of analysis that's sort of facially wrong, and facially sort of admits on its own terms why it's futile, why it's like futility is wrong. That would be the kind of thing that I think it might serve to remand saying that's not how we do futility analysis, or that's not how it ought to be done. And I think that's the kind of circumstance here where we have a number of errors that facially ought to be corrected. And I think dismissal without prejudice would be one way to do that. Even if this court disagrees with me that our amended complaint adequately states the claim. All right. Thank you. The case is submitted. Thank you.
judges: Pillard; Walker; Garcia